UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------x

DERRICK THOMAS,

                   Petitioner,

   -against-

WILLIAM PHILLIPS, Superintendent,
Green Haven Correctional Facility,

                   Respondent.

-----------------------------------------------------x

ORIGINAL
D ε F
C / M

**MEMORANDUM AND ORDER**
Case No. 04-CV-0906 (FB)



*Appearances:*
*For the Petitioner:*
DERRICK THOMAS, *pro se*
00-A-0668
Green Haven Correctional Facility
Post Office Box 4000
Stormville, New York 12582

*For the Respondent:*
ELIOT SPITZER, ESQ.
Attorney General of the State of New York
By: LAURIE M. ISRAEL, ESQ.
Assistant Attorney General
120 Broadway
New York, NY 10271

**BLOCK, Senior District Judge:**

       Petitioner, Derrick Thomas ("Thomas"), is currently in custody pursuant to

a judgment of the Supreme Court of the State of New York, Queens County, convicting

him of robbery, reckless endangerment and four counts of criminal possession of a weapon.

Proceeding *pro se* and *in forma pauperis*, Thomas petitions the Court for a writ of *habeas*

*corpus* pursuant to 28 U.S.C. § 2254 and raises a host of challenges to his convictions.

Because, as explained below, those challenges are without merit, the petition is denied.

## A. Overview[1]

Thomas' convictions stem from two robberies. On November 20, 1997, Tufail Ahmed ("Ahmed") and his wife were working at their grocery store in Jamaica, Queens. A man entered the store at approximately 8:30 p.m., spent a few minutes looking at items, and brought several bags of chips to the cash register. He then pointed a gun at Ahmed, who was working behind the counter, and demanded money; Ahmed gave him between $300 and $350 from the register. The robber demanded more money and fired a shot, which lodged in a video cassette behind the counter. After trying to grab the gun, Ahmed told the robber that there was more money hidden in a file folder under the counter; the robber took between $200 and $300 from the folder. The robber then took Ahmed and his wife to the back of the store, told them not to move or say anything, and left. Ahmed called 911. Police responded and recovered the video cassette and a deformed bullet; they also drove around the neighborhood with Ahmed in an unsuccessful attempt to find the robber.

Three days later, on November 23, 1997, police responded to a report of an armed robbery at a Chinese restaurant located about two miles east of the Ahmeds' store; a single bullet lodged in the wall of the restaurant was recovered. Shortly after the robbery, at approximately 7:30 p.m., Officer Glenn Kimelstein ("Kimelstein"), who was on

---

[1]The following is a general overview of the facts giving rise to Thomas' convictions. Additional facts relevant to a particular claim are incorporated into the discussion of that claim.

patrol in the area, received a radio transmission describing the robber as a black male, approximately six feet tall, armed with a gun and wearing "black or dark" clothing and a hooded jacket. Tr. at 9.[2]

Between five and ten minutes later, Kimelstein saw Thomas walking less than two blocks from the restaurant. Kimelstein observed that Thomas fit the description given in the radio transmission, that his jacket pocket was "swinging very heavily," and that he was "try[ing] to hide that side of his body as he was walking." *Id.* at 11.

Kimelstein stopped Thomas and frisked him. Feeling the outline of a gun, Kimelstein removed from Thomas' jacket pocket a .38 caliber Taurus revolver with a defaced serial number; the five-chamber revolver contained three live cartridges and two spent casings. Kimelstein placed Thomas under arrest.

While Thomas was awaiting processing in a detention cell, Kimelstein overheard Thomas say that "the gun went off by accident, I guess," and, a few minutes later, that "that was a second time that that had happened." *Id.* at 391. Later that night, Detective Kelvin Miles ("Miles") questioned Thomas after informing him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966); during the questioning, Thomas wrote and signed a statement reciting that "I have a gun. I have a gun in hand. I saw a lady. I stopped, the gun went off. I did not mean to shoot anyone." *Id.* at 437.

Because of similarities between the November 23 robbery and the November 20 robbery of the Ahmeds' store, police asked Ahmed to review a photo array containing Thomas' photo; Ahmed positively identified Thomas as the perpetrator of the November

---

[2]"Tr." refers to the transcript of the state-court proceedings.

20 robbery. Ahmed then picked Thomas out of a lineup.

## B. State-Court Proceedings

Thomas was charged in two separate indictments. One charged him with one count each of first-degree robbery, first-degree reckless endangerment, second-degree weapons possession and third-degree weapons possession, all in connection with the November 20 robbery. The other charged him with two counts of third-degree weapons possession in connection with the November 23 robbery; more serious charges were not brought due to lack of cooperation from the victim of that robbery. On the prosecutor's motion, the two indictments were consolidated for trial.

At trial, the prosecution established the facts recounted *supra*. Thomas testified in his own defense. With respect to the November 20 charges, Thomas' counsel pursued a misidentification defense. In addition to eliciting Thomas' denial of the charges, counsel thoroughly cross-examined Ahmed about his testimony that the robber was approximately six feet tall, 155 pounds and 35 years of age at the time of the robbery. Counsel relied in particular on a written summary of Ahmed's 911 call (a so-called SPRINT report), which suggested that Ahmed had initially described the robber as "five foot six inches, 30 years old and 170 pounds," Tr. at 270; Ahmed denied having given such a description. Because the actual tape recording of the call had been destroyed pursuant to standard police procedure, the trial court allowed defense counsel to introduce the SPRINT report into evidence.

With respect to the November 23 weapons charges, counsel pursued the defense that Thomas either did not knowingly possess a firearm or that he did not intend

4

to retain possession of it. In support of this defense, Thomas testified that, after seeing someone put a bag down behind a car, he retrieved the bag and put it in his pocket, ostensibly because "[he] collect[s] stuff." *Id.* at 496.

Thomas was convicted on all counts. On January 6, 2000, he was sentenced to 20 years' imprisonment.[3]

On direct appeal, Thomas' appellate counsel argued that Kimelstein had stopped and frisked Thomas without probable cause; Thomas raised additional arguments in a supplemental *pro se* brief. The Appellate Division, Second Department, held that "the police had reasonable suspicion to stop and frisk [Thomas,]" and that the "contentions raised in [Thomas'] supplemental *pro se* brief are either unpreserved for appellate review or without merit." *People v. Thomas*, 743 N.Y.S.2d 280 (2d Dep't 2002). Leave to appeal to the Court of Appeals was denied. *See People v. Thomas*, 98 N.Y.2d 702 (2002) (table).

Unhappy with his appellate counsel's failure to raise certain issues, Thomas petitioned the Appellate Division for a writ of error *coram nobis*. On December 23, 2002, the Appellate Division held that Thomas had "failed to establish that he was denied the effective assistance of appellate counsel." *People v. Thomas*, 752 N.Y.S.2d 552, 553 (2d Dep't 2002) (citing *Jones v. Barnes*, 463 U.S. 745 (2002)). The record does not reflect whether Thomas, though authorized to do so, *see* 2002 N.Y. Laws ch. 498 (eff. Nov. 1, 2002) (amending N.Y. Crim. Proc. L. § 450.90), sought leave to appeal to the Court of Appeals.

---

[3]Thomas was sentenced to 20 years on the robbery count, 12 years on the second-degree weapons-possession count, 7 years on one of the third-degree weapons-possession counts, and 3½-7 years each on the reckless-endangerment count and the two remaining third-degree weapons-possession counts. The trial court ordered that all sentences would run concurrently.

Thomas then moved the trial court to vacate his convictions pursuant to New York Criminal Procedure Law § 440.10. On November 19, 2003, the trial court denied the motion on that grounds that Thomas's motion papers were "legally and factually indequate," and that he had "failed to serve the Office of the District Attorney with a copy." Israel Decl., Ex. O. The Appellate Division denied leave to appeal on February 18, 2004. *See id.*, Ex. R.

## C. *Habeas* Petition

On February 24, 2004, Thomas filed the subject *habeas* petition. The petition is presented in several sets of papers and in less than clear language. Taken together and liberally construed, Thomas' submissions present the claims addressed below.

## II.

## A. Standards of Review

Only federal issues may be raised on *habeas* review. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to Thomas' petition, places further constraints on *habeas* petitions challenging state-court judgments. First, AEDPA requires that such petitions be filed, in most circumstances, within one year of the date the judgment became final. *See* 28 U.S.C. § 2244(d)(1)(A). Second, AEDPA requires that a *habeas* petitioner exhaust his state-court remedies, *see id.* § 2254(b-c), by "present[ing] his federal constitutional claims to the highest court of the state," *Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir. 1991); "[t]he state court must be fairly apprised that petitioner is raising a federal constitutional claim and of the factual and legal premises underlying the claim." *Id.* "An application for a writ of *habeas*

*corpus* may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

AEDPA also closely circumscribes *habeas* review of claims that a state court has adjudicated on the merits, that is, "based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001). *Habeas* relief may not be granted for such claims unless the state-court decision (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

If, instead of reaching the merits, the state court denies a federal claim based on an "independent and adequate state procedural rule, federal *habeas* review of [the] claim[] is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The state court's reliance on such a rule, however, must be "clear from the face of the opinion." *Id.* at 735 (internal quotation marks omitted). Thus, "when a state court uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Commissioner of Corr. Servs.*, 235 F.3d 804, 810 (2d Cir. 2000).

The degree of deference to be given to a disjunctive state-court holding is "anything but clear." *Shih Wei Su v. Filion*, 335 F.3d 119, 126 & n.3 (2d Cir. 2003) (comparing *Ryan v. Miller*, 303 F.3d 231 (2d Cir. 2002) (giving AEDPA deference), with *Miranda v. Bennett*, 322 F.3d 171 (2d Cir. 2003) (declining to give AEDPA deference)). Until it is resolved by the Second Circuit, this potentially thorny issue can be avoided if the claim can be denied on *de novo* review. *See, e.g., Robinson v. Ricks*, 2004 WL 1638171, at *8 n.8 (E.D.N.Y. Jul. 22, 2004) (declining to decide whether AEDPA deference applied "because [petitioner's] claim . . . fails even under a *de novo* standard of review.").

The timeliness of Thomas' petition is not in dispute. Respondent argues that most, if not all, of the claims presented in the petition are unexhausted and, at this point, procedurally barred. Given that the claims Thomas has presented – both in the state courts and here – are numerous and, at times, difficult to unravel, determining which claims are exhausted and/or procedurally barred would prove a daunting task. In the interest of judicial economy, the Court will instead address all the claims on the merits and *de novo*.

## B. Thomas' Claims

### 1. Self-Incrimination

As previously noted, two of Thomas' post-arrest statements were introduced at trial. Thomas argues that because he was not given *Miranda* warnings at the time of his arrest, the introduction of those statements violated his Fifth Amendment right against self-incrimination.[4]

---

[4]Thomas also argues that the prosecutor failed to give timely notice of his intent to introduce the statements at trial, in violation of New York Criminal Procedure Law § 710.30. Because it is merely a rule of state criminal procedure, "courts in this Circuit

Contrary to Thomas' assertion, *Miranda* warnings come into play only when "a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). "That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 (footnotes omitted). By contrast, "[v]olunteered statements of any kind are not barred by the Fifth Amendment[.]" *Miranda*, 384 U.S. at 478

Although Thomas had not been given *Miranda* warnings when he made the statement overheard by Kimelstein, the record demonstrates that the statements were not made in response to "either express questioning or its functional equivalent." *Innis*, 446 U.S. at 300. The record also demonstrates that the written statement given to Miles was prepared and signed after the required *Miranda* warnings had been given. Thus, the admission of the statements did not violate the right against self-incrimination.

## 2. *Due Process*

"The right to a fair trial is a fundamental liberty secured by [the Due Process Clause of] the Fourteenth Amendment." *Estelle v. Williams*, 425 U.S. 501, 503 (1976). Thomas argues that this right was violated in several respects.

### a. Consolidation

Thomas argues that the consolidation of the two indictments violated due

---

have held that an alleged violation of [§ 710.30] is not cognizable on *habeas* review." *McCullough v. Filion*, 378 F. Supp. 2d 241, 261 (W.D.N.Y. 2005).

process. "[W]here a defendant is claiming a due process violation based upon joinder of offenses, he must, to succeed, go beyond the potential for prejudice and prove that *actual* prejudice resulted from the events as they unfolded during the joint trial." *Herring v. Meachum*, 11 F.3d 374, 377-78 (2d Cir. 1993); *see also United States v. Lane*, 474 U.S. 438, 446 n.8 (1986) ("Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial.").

Here, Thomas relies on the admission of his post-arrest statement that "I have a gun in hand. I saw a lady. I stopped, the gun went off. I did not mean to shoot anyone," Tr. at 437, to demonstrate actual prejudice. He argues that, while the statement referred only to his possession of a weapon on November 23, the jury improperly considered it in connection with the weapons charges relating to the November 20 robbery.

A limiting instruction from the trial court would have easily disposed of Thomas' claim, *see Meachum*, 11 F.3d at 378 (finding no prejudice because, "[b]ased on the [limiting] instructions, the jury seems to have carefully evaluated the evidence on each count separately."); unfortunately, no such instruction was given. Nevertheless, the record does not support Thomas' contention that the jury improperly used his post-arrest statement. The prosecution presented the evidence relating to the November 20 robbery in its entirety before presenting evidence regarding the events of November 23; Thomas' statement was admitted during this latter part of the prosecution's case, thereby weakening the claim that the jury considered it in connection with the charges stemming from the November 20 robbery. *See id.* ("[B]ecause the evidence with respect to each [crime] was

distinct and easily compartmentalized, the risk of jury confusion at petitioner's trial was significantly limited.").

Moreover, the jury also heard Kimelstein's testimony that he had overheard Thomas say "that was a second time" that the gun had allegedly gone off accidentally, Tr. at 391; the first time was presumably on November 20. Taken in context, then, Thomas' statement to Miles could only be understood as referring to the events of November 23.

To the extent that Thomas means to argue that his post-arrest statements intimated uncharged crimes (either the November 23 robbery or a shooting), his argument is unfounded. The trial court redacted all mention of the robbery from the statement and, after it had been read into evidence, instructed the jurors that "there is no allegation of anybody getting shot at all in this case." *Id.* at 437.

In sum, because consolidation of the two indictments did not result in any actual prejudice to Thomas, it did not violate due process.

### b. Identification Evidence

As noted above, Ahmed identified Thomas after reviewing a photo array and a lineup. At a pretrial hearing, the trial court suppressed the lineup identification on the ground that only one other member of the lineup resembled Thomas. At another pretrial hearing, however, the trial court concluded that Ahmed's identification was independently reliable; consequently, he was allowed to identify Thomas at trial. Thomas argues that this in-court identification violated his due-process right to a fair trial.

Due process requires that testimony from an eyewitness identifying the witness as the perpetrator of a crime be "reliable." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d

Cir. 2001) (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), for the proposition that "reliability is the linchpin in determining the admissibility of identification testimony"). When the eyewitness has identified the defendant prior to trial (for example, after reviewing a photo array or a lineup), the identification will be admissible only if "(a) the [pretrial identification] procedures were not suggestive or (b) the identification has independent reliability." *Id.; see also Dunnigan v. Keane*, 137 F.3d 117, 128 (2d Cir. 1998) ("If the pretrial procedures were impermissibly suggestive, due process requires that the identification testimony be excluded unless a threshold level of reliability can be established through evidence that is independent of the suggestive procedure."). In determining independent reliability, the "corrupting effect of the suggestive identification" is to be weighed against "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson*, 432 U.S. at 114 (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

Contrary to Thomas' contention, Ahmed's in-court identification did not violate due process. Ahmed had seen Thomas in his store a few days before the robbery. On the night of the robbery, Thomas was the only customer in the store, which was well-lit; as a result, Ahmed closely observed Thomas for four or five minutes before he approached the counter and demanded money at gunpoint. At that point, Ahmed, standing less than 30 inches from Thomas, had an unobstructed view of the latter's face. Moreover, prior to reviewing the lineup, Ahmed gave a detailed and generally accurate description of

Thomas. Finally, at the lineup, which took place only three days after the robbery, Ahmed identified Thomas without equivocation. These factors compel the conclusion that Ahmed's identification testimony was reliable and independent of any suggestive influence of the lineup.

## c. Failure to Preserve Evidence

The tape recording of Ahmed's 911 call was destroyed pursuant to standard police procedure. Thomas argues that the destruction of this evidence violated *People v. Rosario*, 9 N.Y.2d 286 (1961), which entitles a defendant to examine any pretrial statements made by the prosecution's witnesses; however, because *Rosario* does not present a federal question cognizable on *habeas* review, *see, e.g., Brown v. McKinney*, 358 F. Supp. 2d 161, 171 (E.D.N.Y. 2005), the Court construes the claim as alleging a due-process violation arising out of the failure to preserve evidence.

"Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 488-89 (1984) (footnote and citation omitted). Moreover, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1989).

The 911 tape had exculpatory value in that it apparently suggested that, in contrast to his trial testimony, Ahmed had initially identified the robber as "five foot six, 30 years old, approximately 130 pounds." Tr. at 264. However, Thomas has offered no evidence that the tape was destroyed in bad faith. Moreover, defense counsel could and did obtain comparable evidence, namely, the SPRINT report accurately memorializing the 911 call; the report was admitted into evidence and used by defense counsel to vigorously cross-examine Ahmed regarding his identification. Having failed to show bad faith and materiality, Thomas cannot show that the failure to preserve the 911 tape violated due process.

The same result would obtain if the claim were construed as alleging a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), under which prosecutors have a duty "to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (citing *Brady*, 373 U.S. at 87). "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *Id.* (citing *Giglio v. United States*, 405 U.S. 150 (1972)).

To establish that a breach of this duty amounted to a due-process violation, "a defendant must show that: (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *Id.* at 140 (citing *Strickler v. Greene*, 527 U.S. 263 (1999)). Here, even assuming that Thomas could satisfy elements (1) and (2), he has failed to demonstrate prejudice; as explained above, the SPRINT report admitted

14

at trial was an adequate substitute for the 911 tape.

### d. Preparation and Questioning of Witnesses

Thomas argues that he was denied a fair trial because the prosecutor was allowed to "prep" witnesses and ask leading questions at trial. Regarding the former contention, the record reflects only that the prosecutor discharged his obligation to prepare for trial by interviewing witnesses prior to trial. *Cf. Cook v. Houston Post,* 616 F.2d 791, 794 (5th Cir. 1980) (noting that prosecutor "would have been negligent in his duties . . . had he not interviewed witnesses before presenting their testimony to the Grand Jury"). While there were inconsistencies between some of those witnesses' pretrial statements and their trial testimony, there is no indication that the inconsistencies were the result of coaching or other prosecutorial misconduct; in any event, the inconsistencies were thoroughly explored at trial by defense counsel.

As for the latter contention, "a ruling permitting the prosecution to ask leading questions is a matter of state evidentiary law [and] the validity of such a ruling is reviewable in a federal *habeas corpus* proceeding only insofar as it resulted in a trial so fundamentally unfair as to deny [the defendant] due process." *Wallace v. Lockhart,* 701 F.2d 719, 725 (8th Cir. 1983). Here, the trial court permitted the prosecutor to ask leading questions to prevent witnesses from referring to the uncharged November 23 robbery. This ruling did not violate due process; indeed, far from undermining Thomas' right to a fair trial, the trial court's ruling enhanced the fairness of the proceedings.

### e. Interested-Witness Instruction

Thomas argues that he was denied a fair trial when the prosecutor, during

his summation, told the jury that "[the judge] is going to tell you that under the law the defendant is an interested witness [and] because he has a personal interest you can decide whether that colors his testimony." Tr. at 555-56. This statement was simply a reference to the court's anticipated instructions; such references – which are commonplace – are not attempts to usurp the court's role.

To the extent Thomas means to challenge the trial court's interested-witness instruction, the challenge is likewise without merit. An instruction identifying the defendant as an interested witness does not violate due process as long as it is balanced. *See, e.g., Evans v. Artuz,* 68 F. Supp. 2d 188, 198 (E.D.N.Y. 1999) (citing *United States v. Matias,* 36 F.2d 744, 750 (2d Cir.1988)). Here, the trial court's instruction was balanced both in the sense that it informed the jury that "[the defendant's] interest does not preclude a finding that he or she is telling the truth," *id.,* and in the sense that it informed the jury that it could consider the interest of *any* witness in assessing credibility. *See Matias,* 36 F.2d at 750 ("We have also approved language to the effect that a defendant's testimony is to be judged in the same way as that of any other witness." (citation and internal quotation marks omitted)).

### f. Jury Deliberations

Thomas claims that he was denied a fair trial because the trial judge interrupted his jury instructions to take an emergency phone call regarding his wife, who was in the hospital; he later told the jury,

> I apologize for the break that I took before. Do not let this reflect on the amount of time. You have all the time you need. Don't rush anything. I will deal with my own things, okay.

16

Tr. at 607. Although the details of the claim are not entirely clear, Thomas appears to argue that the jury, out of sympathy for the judge's situation, rushed its deliberations.

Jurors are presumed to follow the court's instructions unless there is an "overwhelming probability" that they were unable to do so. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987). No such probability exists here; indeed, the jury's requests for evidence, read-backs, and reiteration of jury instructions demonstrate that they heeded the trial court's admonition not to rush their deliberations.

### 3. *Impartial Jury*

"A criminal defendant in a state court is guaranteed an 'impartial jury' by the Sixth Amendment as applicable to the States through the Fourteenth Amendment." *Ristaino v. Ross*, 424 U.S. 589, 595 n.6 (1976) (citing *Duncan v. Louisiana*, 391 U.S. 145 (1968)). Thomas argues that "Ms. Bullock, Ms. Segovia, [and] Mr. Lui," Pet., did not satisfy that standard.

Lui was challenged by defense counsel and, as a result, did not sit on the jury. In *Ross v. Oklahoma*, 487 U.S. 81 (1988), the Supreme Court clearly held that the use of a peremptory challenge to strike a prospective juror who should have been excused for cause negates any claim that the jury was not fair and impartial. *See id.* at 86 ("Any claim that the jury was not impartial . . . must focus . . . on the jurors who ultimately sat.").

Bullock and Segovia did sit on the jury. Bullock testified that her occupation was "Police Department clerical," Tr. at 35, but that she would have no problem being open minded and impartially judging the credibility of police officers; indeed, in response to a question from defense counsel, she affirmed that, in her experience, there were "good cops

17

and some bad cops." *Id.* at 86. Similarly, Segovia testified that, although she was a New York City police officer, she, too, could impartially judge the credibility of other officers; by way of follow-up, she voiced her belief that police officers sometimes lie, that racial profiling "definitely" goes on in the department, and that evidence tampering and frame-ups are "possible." *Id.* at 84-86. Both prospective jurors were seated without objection.

"The mere fact of membership on a police force is not presumptively a disqualification for service on a jury in a criminal trial," *Mikus v. United States*, 433 F.2d 719, 724 (2d Cir. 1970) (citing, *inter alia, United States v. Wood*, 299 U.S. 123 (1936)); nothing else in the record belies these jurors' testimony that, despite their occupations, they could be impartial. Their service in Thomas' case did not violate the Sixth Amendment.

## 4. *Speedy Trial*

The Sixth Amendment guarantees the defendant in a criminal case the right to a speedy trial. *See Barker v. Wingo*, 407 U.S. 514, 515 (1972). In deciding whether the right has been violated, a court must consider the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530. In this context, prejudice "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect," namely, "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* at 532. "Of these, the most serious is the last." *Id.*

Twenty-two months elapsed between Thomas' arrest on November 23, 1997, and the start of trial on September 14, 1999. With regard to the reason for the delay, the

trial court concluded that, as of May 4, 1999, a delay of 178 days was attributable to the prosecution; while Thomas disputes that calculation, his own calculation attributes 253 days – less than nine months – to the prosecution. Even assuming that the remaining five months between May and September was solely attributable to the prosecution (an assumption that is not supported by the record), the resulting total delay of approximately 14 months is not of constitutional magnitude; the Second Circuit has held that even a delay of 24 months, while "lengthy," is "considerably shorter than that of other cases in which no Sixth Amendment violation has been found." *United States v. McGrath*, 622 F.2d 36, 41 (2d Cir. 1980) (collecting cases).

Moreover, Thomas did not assert his right to a speedy trial until February 26, 1999 – some fifteen months after his arrest – when he moved to dismiss the indictments pursuant to New York Criminal Procedure Law § 30.30, requiring dismissal when the prosecution is not ready for trial within specified time periods. The delay in bringing this motion suggests that Thomas was not so much concerned with obtaining a speedy trial as getting the case dismissed, a suggestion strengthened by the fact that he did not continue to invoke his speedy trial rights after the motion was denied.

Finally, Thomas has not demonstrated that the delay was unduly prejudicial. Thomas' delay in invoking his speedy-trial rights belies any contention that he was subject to undue anxiety because of the delay. While he was incarcerated during the entire pretrial period, any resulting prejudice is mitigated by his conviction in that his pretrial incarceration will be credited against his 20-year sentence. Most importantly, there is no indication that the delay hampered Thomas' ability to present his defense.

19

In sum, considering the factors identified in *Wingo*, the Court concludes that the delay did not violate Thomas' constitutional right to a speedy trial.

## 5. *Ineffective Assistance*

Finally, Thomas raises a blanket claim of ineffective assistance of counsel. To succeed on such a claim, he must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). First, he must show that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms," *id.* at 688; in so doing, he must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Second, he must show prejudice, that is, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694; a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* Failure to satisfy either prong is fatal. *See id.* at 696 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").

Thomas' ineffective-assistance claim does not satisfy *Strickland*. The claim is based on trial and appellate counsel's failure to advance various arguments, most of which are raised in the present *habeas* petition. Whether raised in the petition or not, the arguments Thomas faults counsel for not pursuing are without merit. "The failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which [a defendant] is entitled." *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) (citation and internal quotation marks omitted).

**III.**

Thomas' *habeas* petition is denied. Because he has failed to make a substantial showing of the denial of a federal right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253.

**SO ORDERED.**

FREDERIC BLOCK
United States Senior District Judge

Brooklyn, New York
January 5, 2006